### KINNEAR–WEED CORPORATION
### v.
### HUMBLE OIL & REFINING COMPANY.
#### Misc. No. 68–H–40.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 5, 1969.

On Plaintiffs Objection to Findings of Facts and Conclusions Nov. 12, 1969.

Modification of Findings of Fact and Conclusion Dec. 1, 1969.

Final Judgment Nov. 12, 1969.

Fred Parks, Houston, Tex., William E. Kinnear, Beaumont, Tex., and W. Frank Stickle, Jr., Washington, D. C., for plaintiff.

Baker, Botts, Shepherd & Coates, Garrett R. Tucker, Jr., and C. O. Ryan, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *History of the Litigation*

CONNALLY, Chief Judge.

This controversy has wound its tortuous way through various courts of the land for 16 years. Basically no more than a routine patent infringement action which was concluded with the denial of certiorari by the Supreme Court of the United States November 23, 1959, 361 U.S. 903, 80 S.Ct. 210, 4 L.Ed.2d 158, the matter has been kept in litigation by the indefatigable efforts of counsel for the plaintiff. Following the action of the Supreme Court mentioned above, there have been innumerable motions in the Court of Appeals for the Fifth Circuit for rehearing, for reconsideration, to recall the mandate, for mandamus, etc. Similar relief has been requested repeatedly of the Supreme Court of the United States, 363 U.S. 857, 80 S. Ct. 1608, 4 L.Ed.2d 1740.

While no doubt the Court of Appeals is familiar with the background of the case by reason of these facts, nevertheless because the chronology of events is of considerable importance, and for ready reference, there is set out below a number of relevant dates at which time the action as indicated took place.

*April 6, 1953.*

The original and basic action was filed by plaintiff Kinnear-Weed Corporation against Humble Oil & Refining Company, Civil Action No. 2363, in the Beaumont Division for the Eastern District of Texas. While primarily a suit for the infringement of Patent 2,380,112 and of re-issue patent 23416, to C. W. Kinnear, covering a drill bit for use in drilling for oil and gas, plaintiff joined in this proceeding allegations of violation of confidential disclosure, unfair competition, and violation of both the federal and the state anti-trust statutes. Judge Joe W. Sheehy of Tyler, Texas, at that time the only judge for the Eastern District, undertook initial handling of the case.

Within a few months thereafter plaintiff filed three separate actions in the Southern District of Texas against Reed Roller Bit Company (C.A. 7385), Hughes Tool Company (C.A. 7708) and Hunt Tool Company (C.A. 7752)—all drill bit manufacturers—for infringement of the same patents. Action in these cases was withheld pending disposition of the Eastern District case.

*September 9, 1954.*

The Honorable Lamar Cecil, then a practicing attorney in Beaumont, Texas was appointed United States District Judge for the Eastern District of Texas. He assumed jurisdiction of C.A. 2363.

*March 1, 1955.*

Following extensive discovery and pretrial proceeding, Judge Cecil began trial of C.A. 2363, to the court. The trial consumed five weeks.

*September 28, 1956.*

After exhaustive briefing and argument, on this date Judge Cecil filed his Findings of Fact and Conclusions of Law, reported 150 F.Supp. 143. These findings were essentially to the effect that plaintiff had shown no cause of action against Humble for breach of confidence, for unfair competition, or any anti-trust violation. It was likewise held that the patent in suit was not infringed by Humble and that the patent was invalid as anticipated by the prior art.

*October 10, 1956.*

Judge Cecil entered final judgment in favor of Humble, and against the plaintiff, dismissing the complaint.

*January 7, 1957.*

Petitioner's motion for new trial was denied by Judge Cecil.

*February 14, 1958.*

The death of Judge Cecil occurred.

*September 22, 1958.*

The Court of Appeals for the Fifth Circuit affirmed the judgment of the District Court in all respects (259 F.2d 398). Thereafter in a supplemental opinion of May 17, 1961 (296 F.2d 215), the Court modified its original opinion by striking from the judgment of the District Court the provision that re-issue patent 23416 was invalid and void, as the District Court should not have reached that issue in view of its finding of noninfringement.

*April 30, 1959.*

The Court of Appeals denied the first motion for rehearing.

*July 2, 1959.*

The Court of Appeals denied the second motion for rehearing (266 F.2d 352).

*September 28, 1959.*

Plaintiff applied for certiorari to the Supreme Court of the United States wherein for the first time allegations were made that Judge Cecil was disqualified to try C.A. 2363 by reason of alleged business connections with Humble.

*November 23, 1959.*

Supreme Court denied the petition for certiorari, 361 U.S. 903, 80 S.Ct. 210, 4 L.Ed.2d 158.

*December 17, 1959.*

Plaintiff undertook to file a petition for rehearing on the denial of certiorari,

repeating the charges of disqualification. This was received by, but not filed by, the Supreme Court.

*December 18, 1959.*

The Court of Appeals issued its mandate to the United States District Court for the Eastern District of Texas affirming the District Court judgment.

*1960–1962.*

During this interval plaintiff filed a series of motions both in the Court of Appeals and in the Supreme Court seeking a recall of the mandate, a setting aside of the original judgment, and other relief. While these motions were denied, they were of importance in that in these motions the allegations of the disqualification of Judge Cecil by reason of business interests and connections with defendant Humble are repeated and expanded. Additionally, fraud on the part of Humble was alleged in the introduction in evidence in the original trial of Exhibit D–31, an old drill bit, manufactured about 1910–12 and found in the Hughes Tool Company "Bit Museum". D–31 was offered as a part of the prior art. Plaintiff alleged that it was deliberately altered and modified prior to being received in evidence.

In motions filed during this interval (particularly see "Motion to Recall Mandate, Etc." filed October 3, 1960), plaintiff attacked the honesty and integrity of Judge Cecil, and of Judges Hutcheson, Rives, Jones and Wisdom of the Court of Appeals in the most intemperate language.[1] The business dealings between Judge Cecil and Humble (about which

much more will appear hereafter) was alleged; and it was further alleged that Judge Hutcheson had very extensive and disqualifying business dealings with Humble.

*May 29, 1962.*

The plaintiff filed a new and independent action in the United States District Court for the District of Columbia against Humble Oil & Refining Company, Standard Oil Company of New Jersey and a number of officers and directors of these corporations. The prayer was that the judgment in the original Eastern District of Texas case (Civil Action 2363) be set aside, a new trial be granted and for other relief.

*July 7, 1962.*

Plaintiff filed in the United States District Court for the Southern District of Texas a series of 23 separate civil actions against all of the major oil companies, alleging the infringement of the same Kinnear patent at issue in the Eastern District litigation. Action on these cases was withheld by the various judges of the Southern District on whose dockets they fell pending outcome of the efforts to set aside the judgment in the Eastern District litigation.

*September 23, 1963.*

Plaintiff filed still another suit in the United States District Court for the Southern District of Texas against Humble Oil & Refining Company, Standard Oil Company of New Jersey and a number of individuals making essentially the same allegations and seeking the same relief as in the District of Columbia

---

1. It is alleged that the Judges mentioned "have practiced lowdown common thievery' for appellee and against appellant." It is alleged further that the "misconduct, dishonest and fraudulent acts and omissions of Judges Lamar Cecil, Joseph C. Hutcheson, Richard T. Rives, Warren L. Jones and Minor Wisdom, are disgraceful and illegal." The following is a direct quotation (P. 8): "I, C. W. Kinnear, want to make it perfectly clear to all concerned that if this case is not opened, and, all illegal judgments, decrees and orders [are not set aside and plaintiff given a new trial], then in that event, I, C. W. Kinnear, will go to the Congress of the United States and institute charges of impeachment against each and every judge or justice of the United States courts that has had anything to do with this case up to date * * *." It is further alleged (Pp. 20–21) with respect to the Honorable Joseph C. Hutcheson, Jr. that Judge Hutcheson received "exorbitant royalties" from leases operated by Humble "of one-half (½) of the oil and gas produced from said wells" which plaintiff alleges "to be a form of bribery by appellee to Judge Hutcheson."

litigation. This became Civil Action 63–H–509.

*July 23, 1964.*

The District of Columbia action was transferred to the United States District Court for the Southern District of Texas and became Civil Action 64–H–354. Principally for want of personal jurisdiction, only Humble remained as an active defendant.

Pursuant to local rules and practices for the division of work among the judges of the Southern District of Texas, all of this litigation was assigned to Judge Joe Ingraham.

*August 19, 1964.*

The plaintiff apparently having received the impression from pretrial conferences and rulings that Judge Ingraham was not impressed with the plaintiff's position, the plaintiff sought to disqualify Judge Ingraham for personal bias and prejudice under 28 U.S.C.A. § 144. Bias and prejudice was alleged in that he had "pirated" Civil Action 63–H–509, the original Southern District case, from the docket of one of the other judges. An application for mandamus and prohibition against Judge Ingraham's proceeding in the case was denied by the Court of Appeals.

*October 21, 1966.*

After extensive discovery and a number of pretrial conferences, and after a further unsuccessful effort by mandamus and prohibition to prevent Judge Ingraham from going forward, he set Civil Action 63–H–509 and Civil Action 64–H–354 for trial on the merits February 6, 1967. During this pretrial interval plaintiff was never ready for trial and sought repeated continuances.

*December 30, 1966.*

To forestall the trial of Civil Actions 63–H–509 and 64–H–354, plaintiff filed in the Court of Appeals the present proceeding asking for direct relief in the Court of Appeals. By reason thereof, Judge Ingraham delayed trial of the cases, awaiting disposition by the Court of Appeals.

*October 15, 1968.*

The Court of Appeals filed its en banc opinion referring this action to this Court for hearing. Reference is made to that opinion [403 F.2d 437 (5th Cir. 1968)]. Implicit in the opinion is the following mandate: (1) that the plaintiff be allowed a full opportunity to make proof of the various allegations referred to in the opinion; (2) that this Court make findings and conclusions with reference thereto; and (3) that the matter be expedited.

I think it is abundantly clear from the opinion that in referring the case to this Court for hearing the Court of Appeals made no suggestion or intimation of its feelings as to the merits or demerits of plaintiff's contentions, and further that a hearing was permitted at this late date solely because the allegations put in issue the integrity of a member of the Judiciary and of the judicial process.

*November 26, 1968.*

First pretrial conference was held in this Court and subsequent conference set for January 31, 1969.

*January 31, 1969.*

A second pretrial conference was held. Counsel were advised that the matter would be set for trial within approximately ninety days, the precise date to be determined later. Sometime thereafter notices were sent to counsel of trial setting for May 5, 1969.

*April 25, 1969.*

Plaintiff filed a motion for continuance asserting that many depositions had been noticed but not yet taken and that much additional discovery was desired. Plaintiff sought a continuance until September, 1969. The continuance was granted, but only until June 23, 1969; and counsel were advised that the action would be tried on that date without fail, and that no further motions for continuance would be entertained.

*June 13, 1969.*

Plaintiff filed a further motion for continuance. This motion was denied.

*June 23, 1969.*

Case proceeded to trial. Twenty witnesses were heard and 38 depositions received in evidence. The trial was concluded June 27, 1969.

### Present Posture of the Case

The issues referred to this Court have been heard independently, and not in connection with the trial of the related actions pending in this Court. It was ordered and understood, however, that the issues presented in this proceeding, when finally determined, were not to be relitigated in the trial of the related cases.

As indicated in the "partial pretrial order" of May 5, 1969, I consider the findings and conclusions herein made to be those of a Special Master, under referral of the Court of Appeals. This is so because of the long and bitter controversy of which this is a part. It is my desire that these findings and conclusions be reviewed by the Court of Appeals before becoming effective, in the hope that action thereon by the Court of Appeals may make final disposition of these issues.

The issues before the Court are:

1. Whether Judge Cecil was disqualified under 455 of Title 28 by reason of the following matters, singly or collectively:

 (a) Ownership of Humble stock;

 (b) Connection with Coastal Tool Company;

 (c) Trial and disposition of the Beck case;

 (d) The transactions concerning the Sabine Tram lands;

 (e) His participation in certain drilling ventures, resulting in alleged infringement of plaintiff's patent.

 Additionally, under 1(b), (c) and (d), whether there was any attempt to bribe or to influence Judge Cecil improperly.

2. Humble's alleged "fraud on the Court of Appeals".

3. Humble's alleged "fraud on the trial court" with respect to Exhibit D–31.

### The Ownership of Humble Stock

■ I consider that the opinion of the Court of Appeals makes final and complete disposition of this controversy, holding that ownership of this insignificant amount of stock was not a disqualifying factor. The facts with respect to this controversy are as follows:

(1) In 1944 Mrs. Mary Reed Cecil, the wife of Judge Lamar Cecil, purchased 50 shares of Humble stock with funds from her separate property and estate.

(2) In 1951 as result of a two-for-one stock split she received an additional 50 shares, for a total of 100.

(3) Shortly after Judge Cecil assumed the bench, and on learning that he would try the original action against Humble, he advised his wife that it would be necessary that she sell her 100 shares of Humble stock.

(4) Thereafter, with considerable reluctance, Mrs. Cecil made the sale January 21, 1955, and deposited the proceeds in her separate bank account.

### Coastal Tool Company, Inc.

■ (1) Coastal Tool Company, Inc. was organized in 1937. It was engaged in the business of maintenance and repair of oil field equipment in the oil fields in the vicinity of Beaumont, Texas. It did business almost from its inception with a number of the major companies operating in these oil fields, including Humble. W. M. Schultz was the moving party and the controlling stockholder then and at all material times.

(2) About 1945 Judge Cecil, then a practicing attorney in Beaumont, bought 15 shares of stock from one of the original stockholders for $7,000, this constituting a 25% stock interest. The stock was closely held by only three stockholders (Schultz, 50%; Means, 25%; Cecil, 25%).

(3) Shortly thereafter Judge Cecil was made Secretary-Treasurer of the corporation, became a director, and he and his law firm represented Coastal. The legal representation was minimal, consisting primarily of the collection of a few delinquent accounts.

(4) Following his appointment to the bench in 1954, Judge Cecil continued his connection with Coastal, as a stockholder, an officer, and a director until his death in 1958. Of course, he no longer acted as attorney for the corporation. His former law firm did continue the representation.

(5) Despite drawing a salary as an officer of the corporation, Judge Cecil's contacts with the day-to-day operations of the company were minimal. The salary which was paid to him (as was the case with salaries paid to other officer-stockholders) was not so much as compensation for services as a means of passing on to the stockholders earnings of the company in a form other than as dividends.

(6) The following table shows payments to Judge Cecil by Coastal by way of salary, dividends and director's fees for the years indicated:

| Year | Salary | Dividends | Director's Fees | Total |
|------|--------|-----------|-----------------|-------|
| 1945 | $2,400.00 | $ | $ | $2,400.00 |
| 1946 | 2,400.00 | | | 2,400.00 |
| 1947 | 2,400.00 | | | 2,400.00 |
| 1948 | 2,400.00 | | | 2,400.00 |
| 1949 | 2,400.00 | | | 2,400.00 |
| 1950 | 2,400.00 | | | 2,400.00 |
| 1951 | 3,000.00 | 5,500.00 | | 8,500.00 |
| 1952 | 3,135.00 | 3,750.00 | 300.00 | 7,185.00 |
| 1953 | 3,180.00 | 3,750.00 | 600.00 | 7,530.00 |
| 1954 | 3,180.00 | 3,750.00 | 550.00 | 7,480.00 |
| 1955 | 3,180.00 | 3,750.00 | 600.00 | 7,530.00 |
| 1956 | 3,445.00 | 3,750.00 | 600.00 | 7,795.00 |
| 1957 | 3,445.00 | 2,500.00 | 600.00 | 6,545.00 |
| 1958 | 265.00 | | 50.00 | 315.00 |

(7) From 1938 to date Humble has been a customer of Coastal. The Humble business with Coastal, in relation to Coastal's total business, for the years material to this controversy was as follows:

| Year | Coastal's Total Business | Humble's Business | Percentage |
|------|--------------------------|-------------------|------------|
| 1952 | $263,367.01 | $51,958.03 | 19% |
| 1953 | 226,472.26 | 51,614.06 | 22% |
| 1954 | 203,857.50 | 42,668.53 | 21% |
| 1955 | 202,599.93 | 29,400.22 | 14% |
| 1956 | 243,534.57 | 22,254.70 | 9% |
| 1957 | 207,218.79 | 25,276.60 | 12% |
| 1958 | 133,931.77 | 15,398.83 | 11% |

(8) While the evidence on the issue is scant at best, I think it likely, and find, that Judge Cecil was aware of the fact—if he ever gave it a thought—that Humble was a customer of Coastal.

(9) Undoubtedly some of Humble's home office employees were aware of Judge Cecil's stock ownership in the company. This is so because Humble periodically required the service companies with which it did business—such as Coastal—to furnish Humble a list of its stockholders. This was to permit Humble to ascertain whether any of its own employees were stockholders of such service companies, and subject to a conflict of interest.

(10) There is no evidence that the Humble attorneys or other Humble employees connected with this litigation had actual knowledge of Judge Cecil's stock interest in Coastal. In so far as it may be material, I find that these persons had no such actual knowledge.

(11) There is no evidence which even suggests that Humble at any time increased its patronage of Coastal, paid Coastal anything more than the going rate for the services performed, or in anywise showed preferential or favored treatment to Coastal in connection with the work which it performed for Humble. The suggestion of plaintiff that this was or might be the case, and a devious means of undertaking to influence Judge Cecil, is completely without foundation in the evidence. I so find.

(12) Following Judge Cecil's death, his stock ownership was purchased by other shareholders of Coastal for $17,000.

The Beck Case,
(Bryan D. Beck, Jr., et al
v. Humble, No. 3988, in the
District Court of Chambers
County, Texas)

(1) In early 1953 Bryan D. Beck, Jr., a geologist and oil operator, and a resident of Beaumont, Texas, owned a fractional interest in a ¼₄th overriding royalty in a tract of land in Chambers County, Texas, which was under lease to Humble. Judge Lamar Cecil owned a ¼₂₀th interest in this overriding royalty, his brother-in-law, Randolph Reed, owned a ⅟₈₀th interest, and other persons owned additional fractional interests.

(2) In June 1953 the above mentioned action was filed by Beck and other co-owners of the ¼₄th override against Humble, as lessee, contending that Humble had failed properly to develop the lease. There was a single producing well on a tract of 320 acres; and it was the plaintiff's contention that Humble should drill additional wells. Because the production was sparse, and perhaps for other reasons, Humble resisted this contention.

(3) The plaintiffs were represented by Mr. John H. Benckenstein, a practicing attorney in Beaumont, and by Mr. C. B. Cain, an attorney of Anahuac, Texas. Humble was represented by Mr. Walter B. Morgan of Humble's Legal Department, and by Mr. Guy C. Jackson, of Anahuac, Texas.

(4) The case came to trial in February, 1954. The trial lasted approximately one month and was vigorously pressed by the plaintiffs and defended by Humble. It resulted in a hung jury.

(5) Faced with the prospects of another long and expensive trial, the parties initiated settlement negotiations. Not unexpectedly, the plaintiffs asked more in settlement than the figure for which the case ultimately was settled. At one point plaintiff submitted a figure of approximately $15,000, which included a fee of approximately $2,500 for Mr. Benckenstein and of $1,250 to Judge Cecil. The latter figure was changed to $250, it being stated that the original figure was in error.

(6) Mr. Morgan, for Humble, categorically declined to settle on this basis, and indicated that settlement could be made only on the three following conditions: (a) that the total amount would be in the range of $5,000; (b) that the amount paid would do not more than repay the parties for their out-of-pocket expense; and (c) that no part of the settlement would go to the attorneys as attorney's fees. This obviously was for the purpose of disposing of the case on a nominal basis, without encouraging similar litigation from others similarly placed. This proposal was ultimately accepted.

(7) The settlement was consummated February 16, 1955, when Humble delivered its check in the amount of $5,192.50, payable to the plaintiffs and their attorneys. The check was endorsed by all payees and cashed by Beck who made distribution pro rata to the interested parties.

(8) The parties plaintiff had advanced incidental expenses on a pro rata basis. Judge Cecil received as his share $409.24. By comparison, his brother-in-law, Reed, received $1,636.96.

(9) Judge Cecil was not active in the preparation or trial of the case other than to have a general familiarity with it and to participate in the trial for one day. Beck, by reason of his professional qualifications and his sizable interest, was the moving party and to a large degree controlled the plaintiffs' position throughout.

(10) About the time of the settlement, these royalty owners received an additional payment from Humble. It is suggested by the plaintiff in this action that this was an additional consideration for the settlement, and that such payment, and the settlement itself, was again a carefully veiled attempt to influence Judge Cecil after he assumed the bench. The undisputed evidence affords a clear explanation of such payment. It is as follows. In the single well involved, there were two producing sands, the Frio 1 and the Frio 2. One sand was unitized and the other was not, and the royalty owners involved in the Beck case were entitled to receive, and had supposedly

received, royalties from the unitized sand alone. Humble discovered, however, that by reason of a poor cement job in the well there had been a seepage from one sand to the other of which the company previously had been unaware. By virtue of certain complicated calculations, it was determined that by reason of this fact the royalty owners had been paid an insufficient amount over a period of approximately three years past, and this amount was paid to them.

(11) The evidence is completely devoid of a suggestion that in the defense or the settlement of the Beck case, in the payment of this additional royalty, or in any other matter connected therewith that Humble intended to, or did in anywise favor the plaintiffs, or in particular Judge Cecil. The entire matter was handled as a completely arms length transaction.

### Sabine Tram Lands

(1) In 1937 Earl Hankamer, a businessman and investor, primarily in oil and gas properties, was a partner or joint venturer in a number of oil and gas investments with Mr. T. S. Reed. Mr. Reed was a man of substantial wealth. His three children were Randolph Reed, Mary Reed Cecil (Judge Cecil's wife), and Ruby Reed Graham.

(2) In August 1937 Hankamer purchased in his own name a tract of 80,000 acres of land in East Texas and in western Louisiana, known as the Sabine Tram Lands. He was acting for himself and for T. S. Reed. In addition to a very substantial cash consideration paid to the seller, there likewise was reserved in his favor a $500,000 payment out of $\frac{1}{32}$ of the mineral production. After making the purchase, a portion of the property was sold to third persons and the remainder owned equally by Hankamer and Reed. The Reed share was 38%.

(3) In receiving conveyance of his share from Hankamer, Reed requested that his 38% interest be conveyed one-fourth to himself, one-fourth to Randolph Reed, one-fourth to Mary Reed Ce-cil, and one-fourth to Ruby Reed Graham. The conveyances were made in this fashion.

(4) All parties concerned understood and considered that this constituted a gift by Mr. Reed to his three children, save for the following. It was his intention (and it thereafter came to pass) that out of the first recovery he would repay himself for his investment; and that thereafter all proceeds would go to his children as indicated.

(5) From that time (1937) until 1960, 57 different oil and gas leases were executed by the Hankamer and Reed interests in favor of various oil companies covering different portions of the property and for different periods of time. Ten of such leases were to Humble and 47 were to other oil companies. Judge Cecil joined his wife in executing most, if not all, of these leases as he was required to do under Texas law.

(6) On May 31, 1954, Mr. Reed conveyed the $9\frac{1}{2}$% interest which he had retained in these properties (being one-fourth of the original 38%) in equal shares to his three children. Thus Mrs. Cecil's share was increased from the original $9\frac{1}{2}$% to approximately $12\frac{1}{2}$%.

(7) In the various negotiations and dealings which were had by the Hankamer-Reed interest with the oil companies regarding the various leases, etc., neither Judge Cecil nor Mrs. Cecil ever took any part. All such trades and dealings were handled by Mr. Hankamer and Mr. Reed for a number of years following acquisition of the property. In later years Mr. Raymond Hankamer, son of Earl Hankamer, became active in the management of the property.

(8) The only knowledge of or participation which either Judge or Mrs. Cecil had in these matters consisted of (a) the receipt by Mrs. Cecil of her share of the proceeds, with a statement from her father as to how the matters were to be handled for tax purposes, and (b) the execution by Judge and Mrs. Cecil of the various leases and other instruments,

from time to time, as requested by Mr. Reed and the Hankamers.

(9) For the years indicated, Judge and/or Mrs. Cecil received income from bonuses and royalties, as lessors, *from all sources* (and not restricted to the Sabine Tram Lands):

| Year | Amount |
|---|---|
| 1951 | $ 8,269.93 |
| 1952 | 9,071.05 |
| 1953 | Not Known |
| 1954 | 20,199.05 |
| 1955 | 17,134.02 |
| 1956 | 55,045.84 |
| 1957 | 75,615.69 |
| 1958 | 24,956.84 |
| 1959 | 36,122.86 |
| 1960 | 35,592.28 |
| 1961 | 41,995.87 |
| 1962 | 31,740.58 |
| 1963 | 34,400.53 |

Included in the foregoing total figures are the following bonuses and royalty payments from Humble:

| Year | Bonuses | Royalties |
|---|---|---|
| 1951 | $ | $ 702.73 |
| | | 582.08 |
| 1952 | | 526.61 |
| | | 583.28 |
| 1953 | --------Not computed-------------- | |
| 1954 | | 901.53 |
| | | 851.79 |
| 1955 | | 1,331.44 |
| | | 865.88 |
| 1956 | 3,528.45 | 1,114.36 |
| | | 895.89 |
| 1957 | 8,219.42 | 665.36 |
| | 9,541.76 | 1,200.63 |
| | 8,238.78 | |
| 1958 | | 1,036.85 |
| | | 848.58 |
| 1959 | | 886.80 |
| | | 2,843.97 |
| 1960 | 5,590.60 | 884.76 |
| 1961 | | 899.49 |
| 1962 | | 1,519.34 |
| 1963 | 1,344.17 | 1,474.99 |

(10) There is no evidence which even suggests that Humble sought to or did show any preferential or favored treatment to the Hankamer-Reed interests in the various dealings reflected herein. There is an abundance of evidence that the contrary was true, and that in every instance the dealings were completely at arms length, and were the result of bargaining by each side. The suggestion which plaintiff has advanced that this was another devious method of bribing or influencing Judge Cecil is completely without foundation.

### Judge Cecil as an "Infringer" of Plaintiff's Patent [2]

■ (1) For the period beginning about 1952 and ending with his death in 1958, Judge Cecil was in the habit of investing from time to time in oil drilling ventures, in the position of a "non-operator". The arrangement which was followed uniformly in the instances concerned here was that an "operator" would own or acquire an oil lease upon which he thought a well might be drilled profitably. Such operator would then enter into a contract for the drilling of such well with a drilling contractor, either on a per foot basis, or for a fixed fee to drill to a given depth. The operator would then sell to others, the non-operators, interests in the lease, in order to raise the money to pay the drilling contractor. During the period of time stated Judge Cecil, in company with friends and associates, invested in perhaps some ten or twelve ventures of this character, with one Vratis [3] as operator.

---

2. This issue apparently was not submitted to the Court of Appeals. At least, it is not discussed in the opinion and was not among the issues specifically referred to this Court. It was considered, at plaintiff's request, to afford plaintiff a full hearing and to leave no issues undecided.

3. Plaintiff's entire case on this issue is dependent on the testimony of Vratis. Formerly a resident of Beaumont, he now resides in Montana, and testified by written deposition. He was a very favorable and willing witness for plaintiff. One matter which leads me to question his candor is his statement (P. 6) in answer to an interrogatory, "I would like to offer at this time supporting documents, each of which is an exact duplicate of my original files, a Xerox copy if you will." This is followed by reference to a number of documents which undoubtedly came from Vratis's file. However, included are a number of cancelled checks in his favor drawn by Judge or Mrs. Cecil on their own bank accounts, and copies of their bank statements. No ex-

(2) Of the wells drilled under this arrangement, in perhaps some five or six instances "jet bits" were used by the drilling company. Normally the purchase of the drill bit was an expense of the drilling company, although in at least one instance it was a part of the expense shared by the operator and the non-operators, including Judge Cecil.

(3) In approximately three instances (Manfield Well, Orange County, Texas, 1954; Farris Well, Liberty County, Texas, 1953; and Murphy Well, Harris County, Texas, 1955), Judge Cecil visited the drill site while the well was in progress.

(4) From his general knowledge of the oil business, Judge Cecil probably was aware of the significance of a "jet bit". He was advised by Vratis, or by others, that a jet bit was in use in the drilling of one or more of these wells in which he had an interest.

(5) Judge Cecil had no voice in the selection or purchase of the bits used in any of these instances or with any other details in connection with the drilling of these wells.

(6) Judge Cecil was not an infringer of plaintiff's patent for the following reasons:

(a) Proof is lacking that there was any infingement in use of the "jet bits" in the wells in which Judge Cecil had an interest. Plaintiff continues to labor under the misapprehension—which it has entertained throughout the course of the litigation—that by reason of the patent in suit C. W. Kinnear was the father of "jet drilling"; and that every "jet bit" (with fluid courses through the bit body in such fashion as to direct the drilling fluid directly against the bottom of the hole and not against the cutters) infringes

the patent. This is simply not so. Both Judge Cecil's opinion (which, of course, is suspect here) and the opinion of the Court of Appeals (which is not) so hold. This is confirmed by an examination of the patent in suit. The patent, if valid, is no more than a combination of a number of earlier principles. There is no infringement of such a patent unless all of the combined principles are embodied in the allegedly infringing device. Proof is completely lacking in this respect.

(b) If—for the sake of argument—it be considered that there was infringement, then it was the drilling company, or possibly Vratis, the operator, who was the infringer. "[W]hoever without authority makes, uses or sells any patented invention * * * infringes the patent." 35 U.S.C.A. § 271(a). The non-operator does not "use" and is not responsible for the use of the drilling rig, equipment, etc.

 Patent infringement is considered to be a tortious activity. Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931). To be an infringer, one must actively participate in, or directly benefit from, the infringement. Bewal, Inc. v. Minnesota Mining and Manufacturing Co., 292 F.2d 159 (10th Cir. 1961); Lockerbie, Inc. v. Fruhling, 207 F.Supp. 648 (E.D.Wisc. 1962); Turner v. Quincy Market, etc., Co., 225 F. 41 (1st Cir. 1915).

 Under Texas law a "non-operator", as simply the owner of an interest in realty (the leasehold estate), is not responsible for the torts or contracts of the operator or of the drilling contractor. Seifert v. Brown, 53 S.W.2d 117 (Tex.Civ.App.1932); Snodgrass v. Kelley, 141 S.W.2d 381 (Tex.Civ.App.1940);

planation is given as to how these personal papers of the Cecil's happened to be in Vratis's possession. In light of the fact that plaintiff's counsel under the broad discovery procedures allowed here had secured copies of all of the Cecil's personal papers, including cancelled checks, bank statements, income tax re-

turns, etc. and of the fact that plaintiff's counsel had conferred with Vratis prior to his giving his deposition, I think the conclusion inescapable that he was furnished these documents by plaintiff's counsel from their files, to be included as a part of his testimony.

Rucks v. Burch, 138 Tex. 79, 156 S.W. 2d 975 (1941); Southern Underwriters v. Gariepy, 105 S.W.2d 760 (Tex.Civ. App.1937); Berchelmann v. Western Company, 363 S.W.2d 875 (Tex.Civ.App. 1962).

### Fraud on the Court of Appeals

■ In making reply to one of the various motions to reopen the case filed by plaintiff during the 1960–62 era, Humble filed its "Response of Humble Oil & Refining Company to Motion of Kinnear-Weed Corporation to Open Case, Reverse, Vacate and Set Aside Judgments, Etc." dated December 3, 1960. This document was filed in the Court of Appeals January 26, 1961.[4] In such Response, Humble stated as follows:

"We answered all of Appellant's charges against Judge Cecil, other than that pertaining to his alleged ownership of Humble stock, in Respondent's Objection to Motion of C. W. Kinnear for Leave to File Amicus Curiae Brief, which we filed in the Supreme Court in October, 1959. Since that document is not before this Court at the present time, we quote the pertinent portion as follows:

'Little need be said concerning Kinnear's attack upon the integrity of Judge Cecil, now deceased. *The only showing Kinnear makes of a connection between Judge Cecil and the Respondent is (a) that Judge Cecil*

*owned some stock in Standard Oil Company of New Jersey * * *.' "*
(Emphasis added.)

Plaintiff here contends that the emphasized portion of the above quotation should be construed as an allegation by Humble that there was or had been no business connections between Humble and Judge Cecil, other than the stock ownership. Plaintiff contends that, so construed, the statement is false, pointing to the Coastal Tool matter, the Sabine Tram matter, and the settlement in the Beck case. It is contended thus that this was a false statement made to the Court of Appeals and constituted fraud.

This contention is answered by a careful reading of the quoted language. It is simply an answer to "The only showing Kinnear makes of a connection between Judge Cecil and the Respondent." Read in proper context, the statement is entirely accurate.

There is no indication that Humble's counsel who signed the "Response" had any personal knowledge of the matters mentioned above; or that they intended in anywise to mislead the Court of Appeals or the plaintiff. There is no proof of fraud.

### Fraud Upon the Trial Court— Exhibit D–31 [5]

(1) The term "D–31" has been applied to a certain drill bit received in evidence in the Beaumont trial as defendant's Exhibit 31. The plaintiff has al-

---

4. Copy is found in the record in volume of exhibits entitled "Response to Petitioner to Vacate—Appendix II—Exhibits A–L" filed in the Court of Appeals November 2, 1967, and marked "#77".

5. I have a substantial doubt as to whether this issue was referred to this Court for determination by the Court of Appeals. The opinion states at one point:
 "We therefore conclude that the interests of justice require that there be a judicial factual hearing and determination of the charges in and related to [2], [3], and [4] either singly or in combination."
 referring to the Coastal Tool matter, the Beck suit and the Sabine Tram Lands,

respectively. Thereafter the opinion states:
 "The issues may encompass the charges showing fraud upon this Court. As to the extent that Petitioner undertakes to prove such facts as distinguished from fraud on the District Court, * * * the District Court shall hear and determine and make findings of fact and conclusions of law on that feature of the case."
 Again, however, to afford plantiff a full hearing, and in an abundance of caution, I have permitted proof on this issue. If it is not properly referred, the Court of Appeals may disregard it.

leged, beginning in 1959 and in various motions and proceedings since that date, that this bit was altered and modified by Humble, or by Hughes Tool Company at Humble's connivance and instigation, so as to give a false picture to the trial court.

(2) The bit in question is known as a Hughes 1911 tri-cone rock bit. It is composed of a bit body, with three cones or cutters. Water courses through the body of the bit permit the drilling fluid to be directed directly against the bottom of the hole, and not in a manner to strike the cones.

(3) In light of the fact (a) that in the period approximately 1912–1920 Hughes Tool Company leased the body of bits of this type to its customers, and sold the cones (because the cones became worn and unserviceable after use, and from time to time were replaced), and (b) that the bit body appears to be worn to a greater extent than the cones, the possibility exists that the cones presently on D–31 are not the originals. However, if the cones were ever replaced, this was done prior to 1920. Further, if any such change in the cones was made during that period, there is nothing to indicate that the replacement cones were any different from the original cones.

(4) By 1920 the bit had found its way back to the Hughes Tool Company, where it has remained without change or alteration of any kind since that date.

(5) It has been retained by Hughes as an illustration of a bit developed and used in the early stages of the industry and for many years has reposed in the "Bit Museum". It has been withdrawn from the Bit Museum only for the purpose of photographing, as hereinafter noted, in connection with the Kinnear v. Hughes action in 1954, and for introduction in evidence in the Beaumont case in 1955. It remained in the custody of the Beaumont court until custody was assumed by the clerk of this Court February 11, 1969, for the purpose of having such bit examined by the experts for the respective parties and for introduction into evidence here.

In connection with the findings on this issue, I consider it appropriate to make the following comment. To bring this picture into proper focus, it should be noted that the plaintiff first made this allegation of fraud on the part of Humble, its attorneys, officers, etc. in 1959 while D–31 was in the custody of the Beaumont clerk, and at a time when plaintiff had not seen or examined it for a matter of four years. In formulating the rules under which the parties might make their examination of the bit in this Court, counsel for the plaintiff urged that he be allowed testing that would result in the destruction of the bit, that is, that it would be cut into various pieces, to determine whether it had been modified as plaintiff contended. When pressed by the Court as to the basis of this allegation, and as to whether there was sufficient evidence to warrant this drastic action, counsel was evasive and uncertain. It was stated to the Court on one occasion that plaintiff contended that "something had been removed" from the bit to permit the water courses to play directly on the bottom of the hole. It was stated on another occasion that plaintiff contended that the water courses had been re-bored to permit this result. It was apparent to the Court that counsel either did not know in what manner he contended the bit had been altered, or declined to inform the Court with respect thereto. Hence the parties were allowed full authority to examine the bit except the Court ordered that the bit would not be destroyed or defaced.

After subpoenaing and examining all of the engineers from Hughes Tool Company in anywise connected with the experimental laboratory of that company during the 1953–54 period, the following facts came to light. By the undisputed testimony of these witnesses, fully corroborated by Hughes office records, it was made to appear that in preparation for the defense of the Kinnear-Hughes litigation (to be distinguished

from the present Kinnear v. Humble case), the Hughes attorneys desired to have photographs made to illustrate the fact that various old bits employed the principle of having the water courses directed directly at the bottom of the hole. For this purpose a number of old bits, including D–31, were removed from the Bit Museum. Each was mounted on a drilling rig, the proper connections were made, and photographs were made of the water issuing from the water courses. Further to illustrate this point, Hughes desired to show that this result would be achieved irrespective of whether old style cones or new style cones were employed on two of the bits in question. Hence the Legal Department directed that the Hughes laboratory should fabricate from steel stock four cones or cutters, two to be used with a two-cone 5⅝" bit, the other two to be used with a two-cone 9⅝" bit. These cones were fabricated as ordered. Pictures were made showing old bits with the new cones, and new bits with old cones. These cones were not made for and were not used with D–31. D–31 is a three-cone bit of 9" size and the new cones were not intended to, and could not have been installed on D–31. *At this point in the evidence plaintiff's counsel conceded that he had no case on this issue, and asked to withdraw it from further consideration.*

Plaintiff now states that it made these original allegations of fraud when it learned in 1959—apparently through rumor or hearsay—that Hughes had made some new cones for use with an old bit for the purposes of the lawsuit. Without more, plaintiff assumed that this had been done at Humble's instigation, and that the substitution had been made on D–31. Both assumptions were incorrect.

This argument of the plaintiff's good faith in making the allegation, however, is completely untenable. It appears not only that Hughes made no secret of this activity, but that in the deposition of L. L. Payne (pp. 187–197), Hughes' Vice President, Engineering, taken January 29, 1954, in the Kinnear-Hughes action, attended by both C. W. Kinnear, the patentee, and William E. Kinnear, the attorney, full disclosure was made of these facts. Thus this information was before the president of the plaintiff corporation and its leading attorney for a matter of five years before the allegations of fraud were first advanced. They knew Hughes had made the cones—not Humble. They knew why they were made, the purpose they served, and saw the pictures to illustrate the point. Thus plaintiff has continued to assert these extravagant allegations either with knowledge that they were completely false or without any basis for believing them to be true. In light of these facts I consider the entire allegation to have been little more than a figment of the imagination of the plaintiff's officers and attorneys. If there was any fraud in connection with this issue, the shoe was on the other foot.

### Factual Summary

The issue of stock ownership has been disposed of by the Court of Appeals. The so-called "fraud" issues, in the Court of Appeals and in the District Court, and the patent infringement issue are disposed of by the above Findings of Fact.

There remains the question of disqualification—as a matter of law—by reason of the Coastal Tool connection, the Beck case, and the Sabine Tram Lands. Despite the broad discovery allowed and the innumerable depositions taken while the matter was pending in this Court, the plaintiff has offered nothing here that was not before the Court of Appeals. The facts with respect to these matters as set out above are essentially undisputed.

### Conclusions of Law

The disqualifications statute (§ 455 of Title 28 U.S.C.A.) reads in pertinent part as follows:

"Any justice or judge of the United States shall disqualify himself in any

case in which he has a substantial interest * * * or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial * * *."

■ As I understand plaintiff's position, it is not contended that Judge Cecil had a "substantial interest" in this case. Obviously he did not. He gained not the slightest pecuniary advantage whether the plaintiff won or lost. It is this type of "interest" to which this portion of the statute is directed. Adams v. United States, 302 F.2d 307 (5th Cir. 1962); In re Honolulu Consol. Oil Co., 243 F. 348 (9th Cir. 1917); Long v. Stites, 63 F.2d 855 (6th Cir. 1933), cert. den. 290 U.S. 640, 54 S.Ct. 59, 78 L.Ed. 556; Lampert v. Hollis Music, Inc., 105 F. Supp. 3 (E.D.N.Y.1952).

■ It is contended by plaintiff that by reason of the business dealings with Humble (Coastal Tool, the Beck case and Sabine Tram Lands) Judge Cecil was so "connected with" Humble as to make it improper for him to sit.

As the language of the statute and the cases interpreting it clearly indicate, this is a matter confided to the consideration and discretion of the judge himself [MacNeil Bros. Co. v. Cohen, 264 F.2d 186 (1st Cir. 1959); Weiss v. Hunna, 312 F.2d 711 (2nd Cir. 1963), cert. den. 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073]. While this exercise of discretion may be subject to review, the determination of the judge concerned should be accorded great weight, and should not be disturbed unless clearly erroneous [Voltmann v. United Fruit Company, 147 F. 2d 514 (2nd Cir. 1945)].

His insistence that his wife sell her Humble stock shows that Judge Cecil was sensitive not alone to the provisions of § 455 but to the Cannons of Judicial Ethics as well.[6] Though as a matter of law this minimal interest was not disqualifying, he desired not only to preside fairly, but to give the appearance to all right-thinking persons that he presided fairly. Having determined to sell the stock, it is reasonable to conclude that he considered whether his business dealings with Humble were in any sense disqualifying. Obviously, he concluded that they were not. Bearing in mind that his interests in each instance were completely adverse to those of Humble; that he and they were never joint venturers; that Humble's gains were invariably his losses, his determination that it was his duty to proceed not only was correct but in every sense was in keeping with the high principles which are the obligation of every judicial officer.

No authority with which I am familiar supports the position for which plaintiff argues—that the judge should make disclosure of his personal balance sheet to every litigant who enters his court, to permit the parties, not the judge, to determine whether the judge should sit. Such a proposal is stultifying and degrading to every judge, federal or state. Experience has shown—and this case is a classic example[7]—that the litigants are not so much interested in the con-

---

6. "JUDICIAL CANON 26. PERSONAL INVESTMENTS AND RELATIONS. A judge should abstain from making personal investments in enterprises which are apt to be involved in litigation in the court; and, after his accession to the Bench, he should not retain such investments previously made, longer than a period sufficient to enable him to dispose of them without serious loss. It is desirable that he should, so far as reasonably possible, refrain from all relations which would normally tend to arouse the suspicion that such relations warp or bias his judgment, or prevent his im-

partial attitude of mind in the administration of his judicial duties." (American Bar Association, Canons of Judicial Ethics.)

7. When this matter was referred to the Chief Judge of this District by the Court of Appeals, the first instrument filed here was a motion by plaintiff wherein it was urged that of the seven judges in this District only two (Judges Garza and Singleton) were appropriate for designation to hear this case. In its reply, defendant urged that only one (Judge Ingraham) should be designated.

1386

tents of a judge's portfolio as they are in what they consider to be his predilections.

Plaintiff also argues that routine, arms length business dealings between a litigant and a judge, substantial in amount, though completely unrelated to the subject matter of the litigation should constitute a disqualifying "connection" under § 455. Such a rule would be completely unrealistic. If such were the law, a judge who might have purchased over the years a series of Buick or Chevrolet automobiles for his family use could not sit in an antitrust suit against General Motors. A judge who had paid the bills for utilities service to his residence could not sit in the case if a utility truck struck a pedestrian. Certainly no Federal Judge could sit in a case involving the United States, for both as a taxpayer, and as one who draws a modest monthly stipend for his service from the sovereign, the judge's "connection" would be both substantial and regular.

I conclude that Judge Cecil considered the matter of disqualifications, took appropriate steps to resolve any possible question of interest which he might have, and properly concluded that it was his duty and obligation to continue in the case.[8]

JUDGMENT TO BE ENTERED

I would enter judgment as follows:

(a) Denying plaintiff the relief sought and dismissing the action at plaintiff's costs;

(b) Taxing all costs, including attorneys' fees, expert witness fees and related

matters having to do with the question of Exhibit D–31, against the plaintiff, for the reason that this charge was asserted fraudulently from its inception;

(c) Enjoining plaintiff, its officers, directors, attorneys, etc. from further raising the issues here presented in any further litigation in any court. These baseless charges of fraud, of bribery and corruption directed by the plaintiff not only against its adversary, but against every member of the Judiciary who in performance of his duty has held adversely to plaintiff, should not be permitted to continue. Plaintiff has had its full day in Court on all issues which it desired to raise.

MEMORANDUM:

On Plaintiff's "Objections to Findings of Fact and Conclusions of Law and Requests that Additional Findings of Fact Be Made."

The plaintiff has heretofore filed extended objections to the findings and conclusions heretofore filed, and has requested that additional findings of fact be made. In large measure the objections are simply arguments that the Court should have found differently on the facts, or should have drawn different inferences or conclusions from the evidence. Other objections or requests for additional findings are with respect to purely evidentiary matters or to matters of little consequence.[1]

Being of the view that the findings and conclusions filed herein September 5, 1969, fully and accurately dispose of the ultimate and controlling questions of

8. For other cases in which a disgruntled litigant has sought to vent his spleen against the various judges of the several courts who held against him, by alleging fraud, conspiracy, etc., see Hanna v. Home Insurance Company, 281 F.2d 298 (5th Cir. 1960) and Williams v. Tooke, 108 F.2d 758 (5th Cir. 1940).

1. For example, it is not disputed that Mr. Morgan, as the attorney in charge of the defense of Humble in the Beck case, was fully aware of Judge Cecil's position as a

plaintiff and, prior to his appointment to the bench, as an attorney. No one suggests that he forgot this connection in the course of the Kinnear-Weed v. Humble trial.

Further, I consider it of no consequence that the original 50 shares of Humble stock was issued in Judge Cecil's name, and that thereafter it was transferred to the name of his wife, all of which transpired some 7 or 8 years prior to the institution of the Beaumont litigation.

fact and of law with respect to all of the contentions advanced by plaintiff, the objections thereto, and the request that additional findings be made are denied.

The clerk will file this Memorandum and will furnish a copy to the attorneys for plaintiff and defendant.

MEMORANDUM:

MODIFICATION OF FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED HEREIN SEPTEMBER 5, 1969.

The defendant in its "Defendant's Response to Plaintiff's Objections to Findings of Fact and Conclusions of law * * * " filed herein November 17, 1969, calls attention to two instances in which the Findings and Conclusions heretofore filed apparently are in error. In both instances the matter concerned, in my judgment, is trivial, if not insignificant, and does not affect my ultimate Findings in the slightest. Further, as defendant points out, the Findings originally made tended to be somewhat more favorable to the plaintiff than the record warrants. These are as follows:

### 1. *The Coastal Tool Company Matter.*

In paragraph (9), the Findings state that Humble *periodically* required the service companies—such as Coastal—to furnish Humble a list of its stockholders to determine whether any Humble employee was subject to a conflict of interest. The record states that such reports were not furnished periodically, but that one such report had been furnished by Coastal to Humble.

### 2. *The Beck Case.*

In paragraph (10), the Findings state, "About the time of the settlement, these royalty owners received an additional payment from Humble." In fact, this "additional payment" was made to the royalty owners long prior to the date of the settlement of the Beck case.

For the sake of accuracy, the Findings are amended to conform to the above.

## ORDER OF COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

### NO. 16780

---

KINNEAR-WEED CORPORATION,
Appellant,

VS.

HUMBLE OIL & REFINING COMPANY,
Appellee.

---

(October 1, 1969)

Before BROWN, Chief Judge, and WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, and CARSWELL, Circuit Judges.

BY THE COURT:

It is ordered that the Findings of Fact and Conclusions of Law filed on September 5, 1969, by the Honorable Ben C. Connally, Chief Judge of the United States District Court for the Southern District of Texas, be formally entered by the District Court as in an action tried upon the facts without a jury, pursuant to Rule 52(a), Federal Rules of Civil Procedure, and the District Court is directed to enter an appropriate judgment thereon.

It is further ordered that this cause be withdrawn from further consideration by this Court en banc.

### FINAL JUDGMENT

This cause having come on to be heard in accordance with the opinion dated October 15, 1968, of the Court of Appeals for the Fifth Circuit sitting en banc in Appeal No. 16,780, directing this Court to conduct hearings and to make findings and conclusions with respect to certain issues involved in the petition of Kinnear-Weed Corporation filed in the Court of Appeals on May 18, 1967, seeking relief from the prior final judgments in Civil Action No. 2363, Kinnear-Weed Corporation v. Humble Oil & Refining Co., in the U. S. District Court for the Eastern District of Texas, Beaumont, Division, and the ensuing appeal

therefrom, said opinion also directing this Court to make "the initial determination" of what kind or character of relief, if any, should follow in consequence of this Court's findings and conclusions; and this Court having held such hearing and having heard the evidence adduced thereat, having considered the prior proceedings in this matter, having heard the arguments of counsel, and having made and entered its Findings of Fact and Conclusions of Law dated September 5, 1969, it is hereby

Ordered, adjudged and decreed as follows:

1. Plaintiff's petition for relief from the prior judgments in Civil Action 2363 and Appeal No. 16,780 aforesaid should be and is hereby denied, plaintiff's said petition and any and all causes of action therein should be and are hereby dismissed, and all costs thereof should be and are hereby taxed against plaintiff.

2. Defendant is entitled to have and recover of plaintiff all of defendant's costs and expenses, including attorneys' fees, expert witness fees and related matters having to do with the question of Exhibit D-31, the amount of such costs and expenses to be determined at a hearing or hearings which will be held at a later date, if and when this portion of this judgment is affirmed.

3. Plaintiff, and plaintiff's officers, directors, attorneys and stockholders (including specifically but without limitation Wm. F. Weed, C. W. Kinnear and W. E. Kinnear), both individually and in their capacities as such officers, directors, attorneys and stockholders, and all other persons in active concert or participation with them, be and they are hereby enjoined from further raising and/or litigating any of the issues presented in this proceeding in any further litigation in any court, including but without limitation the actions presently pending in this Court styled Kinnear-Weed Corporation v. Humble Oil & Refining Company, C.A. 64–H–354, and Kinnear-Weed Corporation v. Humble Oil & Refining Company, C.A. 63–H–509. These issues

are the alleged disqualification of Judge Lamar Cecil to try and decide C.A. 2363, the alleged fraud of Humble in failing to disclose and/or concealing such alleged disqualification from plaintiff and/or the courts, the alleged (or insinuated) corruption of Judge Cecil and other members of the judiciary by Humble, and the alleged fraud of Humble and/or Hughes Tool Company respecting Exhibit D–31 in C.A. 2363.